USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ Nos. 92-2312 92-2313 IN RE: TWO APPEALS ARISING OUT OF THE SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Raymond L. Acosta, U.S. District Judge] ___________________ _________________________ Before Selya and Cyr, Circuit Judges, ______________ and Fuste,* District Judge. ______________ _________________________ Paul K. Connolly, Jr., with whom Damian R. LaPlaca, LeBoeuf, _____________________ _________________ ________ Lamb, Leiby & MacRae, Ralph W. Dau, Peter B. Ackerman, Jeffrey W. ____________________ ____________ _________________ __________ Kilduff, O'Melveny & Myers, Raul E. Gonzalez-Diaz, A.J. Bennazar- _______ _________________ _____________________ ______________ Zequeira, Gonzalez & Bennazar, Andrew K. Epting, Jr., G. Trenholm ________ ___________________ _____________________ ___________ Walker, Wise & Cole, Homer L. Marlow, William G. Liston, Marlow, ______ ___________ _______________ _________________ _______ Shofi, Connell, Velerius, Abrams, Lowe & Adler, Deborah A. Pitts, ______________________________________________ ________________ Hancock, Rothert & Bunshoft, Bethany K. Culp, Patrick McCoy, _____________________________ ________________ ______________ Oppenheimer Wolff & Donnelly, Lon Harris, Harris & Green, Stuart ____________________________ ___________ ______________ ______ W. Axe, Lester, Schwab, Katz & Dwyer, Adrian Mercado, Mercado & ______ _____________________________ ______________ _________ Soto, Virgilio Mendez Cuesta, Ernesto Rodriguez-Suris, and ____ _________________________ ________________________ Latimer, Biaggi, Rachid, Rodriguez-Suris & Godreau were on _______________________________________________________ consolidated briefs, for appellants. Gary L. Bostwick, with whom R. Lance Belsome was on brief, ________________ ________________ for appellees Hotel Systems International, et al. Alvaro Calderon, with whom Will Kemp and Monita F. Sterling, _______________ _________ __________________ PSC Liaison, were on brief, for appellee Plaintiffs' Steering Committee. _________________________ _________________________ _______________ *Of the District of Puerto Rico, sitting by designation. SELYA, Circuit Judge. These consolidated appeals SELYA, Circuit Judge. ______________ require us to grapple for the first time with a looming problem in modern federal court practice: how, if at all, should expenses indigenous to a court's handling of mass disaster litigation be reallocated once the winners and losers have been judicially determined? Here, the appellants, late-joined defendants and defendants in cross-claim, prevailed in the underlying litigation. Nonetheless, the district court, coincident with the entry of judgment, effectively foreclosed them from either seeking costs under Fed. R. Civ. P. 54(d) or otherwise lobbying for reallocation of several hundreds of thousands of dollars in court-ordered expense assessments. Finding that the court's abrupt slamming of these doors was improvident, we vacate the relevant portion of the judgment and remand for further proceedings. I. BACKGROUND I. BACKGROUND In 1987, the Judicial Panel on Multidistrict Litigation appointed the Honorable Raymond L. Acosta, a United States District Judge for the District of Puerto Rico, to handle some 270 cases arising out of the deadly fire that had earlier engulfed the San Juan Dupont Plaza Hotel. See In re Fire ___ ___________ Disaster at Dupont Plaza Hotel, 660 F. Supp. 982 (J.P.M.L. 1987) _______________________________ (per curiam). Judge Acosta's stewardship proved "a model of judicial craftsmanship and practical ingenuity." In re Nineteen ______________ Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire _________________________________________________________________ Litig., 982 F.2d 603, 606 (1st Cir. 1992). Among the many ______ 2 successful innovations that brought the litigation to a celeritous conclusion were (1) the creation of a Joint Document Depository (JDD), which housed and copied for distribution all discovery materials, see Pretrial Order No. 127 (Dec. 2, 1988), ___ at 66; (2) the appointment of liaison counsels (plaintiffs' and defendants'), each of whom was responsible for dispersing filings among his or her constituents, see id. at 61-63; and (3) the ___ ___ formation of a Joint Discovery Committee (JDC) dedicated to devising means of expediting the litigation, see In re Recticel ___ ______________ Foam Corp., 859 F.2d 1000, 1001 (1st Cir. 1988) (describing ___________ operation of JDC). To fund these innovations, the district court entered a series of case-management orders which imposed mandatory assessments upon all litigants.1 In this way, the court periodically requisitioned fresh monies as funds on hand were depleted. The orders were silent as to (i) whether or not the court planned to readjust defendants' contributions in light of future developments, and (ii) the court's authority, if any, ____________________ 1Because the mechanics of the allocation process are not critical for present purposes, we supply merely a thumbnail sketch. The Plaintiffs' Steering Committee (PSC) and the defendant San Juan Dupont Plaza Hotel Corporation were assessed a total of $100,000 to defray the JDD's start-up costs. See ___ Pretrial Order No. 127, at 69-70. Thereafter, each litigant paid for JDD-related services actually used. See id. at 70. To cover ___ ___ costs that were not offset by service charges (e.g., the JDD's ____ overhead expenses), the district court imposed mandatory assessments. Initially, at least, the PSC bore 15% of the incremental cost and the defendants, collectively, bore 85%. See ___ id. at 71. Within the defense collective, per-member assessments ___ were presumably equal. 3 to effectuate such reallocations.2 Roughly two years after the first shots in the litigation had been fired, a group of defendants involved in the hotel's ownership and operation settled with the plaintiffs (the fire victims and their families) and cross-claimed for indemnification against various insurers whose liability policies had expired before the fire started (the pre-fire insurers). On August 9, 1989, the plaintiffs followed the cross-claimants' lead, adding the pre-fire insurers as direct defendants under P.R. Laws Ann. tit. 26, 2001, 2003 (1976). Because discovery had formally closed on December 15, 1988, see Pretrial Order No. ___ 127, at 96-97, the pre-fire insurers' investigation of the newly emergent claims against them necessarily centered around a review of documents stored in the JDD.3 ____________________ 2We add a small qualifier to this statement. Pretrial Order No. 127 is a document in excess of 200 pages dealing with a potpourri of matters. The portion of the order that discusses defendants' assessments does not address either of the two points mentioned in the text. However, in the portion of the document that addresses assessments imposed on plaintiffs' attorneys to fund the PSC and enable it to make its cost-sharing contributions, the district court provides for possible "reallocation of expenses based upon the actual, relative recovery" achieved by the various plaintiffs. Id. at 39. At the ___ very end of the document, the district court states that "[t]his Order may be either amended or modified by the Court sua sponte ___ ______ or upon good cause shown." Id. at 205. None of the parties ___ argue that either of the provisions we have identified relate to the possible reallocation of cost-sharing assessments levied against appellants (or any defendants, for that matter). And, none of the other orders contain any language, general or specific, similar to that which we have quoted. 3In one attempt to conduct some independent discovery, the pre-fire insurers moved to reopen discovery for ninety days. The docket sheet indicates that this motion was granted on March 19, 1991, albeit only for a three-day period. 4 The pre-fire insurers quickly filed dispositive motions. The district court, faced with more pressing problems, was slow in addressing the motions. Finally, the court granted them on September 11, 1992, see In re San Juan Dupont Plaza Hotel ___ _________________________________ Fire Litig., 802 F. Supp. 624 (D.P.R. 1992), aff'd, 989 F.2d 36 ___________ _____ (1st Cir. 1993), entered judgment in favor of the pre-fire insurers on all claims, and decreed that the parties would bear their own costs. On appeal, seventeen pre-fire insurers complain that the district court abused its discretion by summarily precluding both an award of costs and a complete or partial refund of the cost-sharing assessments.4 The fire victims, represented by the Plaintiffs' Steering Committee (PSC), and two cross-claimants, Hotel Systems International (HSI) and Dupont Plaza Associates (Associates), filed opposition briefs and participated in oral argument. II. NATURE OF THE STAKES II. NATURE OF THE STAKES In the expectation that describing the disputed expenditures in greater detail will help to put matters in the ____________________ 4The appellants are: Continental Insurance Company, Federal Insurance Company, First State Insurance Company, Granite State Insurance Company, Highlands Insurance Company, Industrial Underwriters Insurance Company, International Insurance Company, Landmark Insurance Company, Protective National Insurance Company of Omaha, Puerto Rico American Insurance Company, Safety Mutual Casualty Corporation, St. Paul Fire & Marine Insurance Company, St. Paul Mercury Insurance Company, California Union Insurance Company, Central National Insurance Company of Omaha, Insurance Company of North America, and Pacific Employers Insurance Company. The latter four carriers filed a separate notice of appeal. Because the arguments are much the same, we treat the two appeals as a unit. 5 proper perspective, we travel that route. A. Court-Ordered Assessments. A. Court-Ordered Assessments. _________________________ The vast majority of appellants' outlays comprise mandatory payments imposed by six orders of the district court. See Pretrial Order No. 48 (Feb. 11, 1988); Pretrial Order No. 67 ___ (Apr. 18, 1988); Pretrial Order No. 127, supra; Pretrial Order _____ No. 135 (Jan. 17, 1989); Pretrial Order No. 212 (July 31, 1989); Order No. 259 (Aug. 21, 1990). Although the first four orders eventuated before appellants entered the fray, those orders required appellants to pay the sums assessed therein shortly after filing entries of appearance. See Pretrial Order No. 127, ___ at 71; Pretrial Order No. 135, at 9. Appellants paid the assessments under protest.5 The compulsory payments total $705,500. Eighty-three percent of this aggregate amount $586,500 represents assessments levied under the four earliest cost-sharing orders. Appellants' tribute helped to fund the various instrumentalities that Judge Acosta had set in place to expedite the litigation. Thus, out of each insurer's total contribution ($41,500), $18,000 went toward defraying the JDD's operating expenses, see Pretrial Order No. 127, at 72; $3,500 went toward ___ defraying the JDC's expenses, see id.; and $10,000 went toward ___ ___ ____________________ 5We fully understand appellants' submissiveness, inasmuch as refusal to pay would have resulted in sanctions, see Pretrial ___ Order No. 127, at 72; Pretrial Order No. 135, at 10, and this court had made no secret of its disinclination to review such orders prior to entry of final judgment. See Recticel, 859 F.2d ___ ________ at 1006. 6 paying costs associated with the office of Defendants' Liaison Person (DLP).6 See id.; Pretrial Order No. 212, at 1; Order No. ___ ___ 259, at 1. The district court originally intended that the remaining $10,000 would subsidize the construction of a new courtroom and related facilities. See Pretrial Order No. 135, at ___ 9. The idea was abandoned and the funds in question were eventually utilized for operational costs of the JDD and DLP. See In re San Juan Dupont Plaza Hotel Fire Litig., 142 F.R.D. 41, ___ _____________________________________________ 46 n.20 (D.P.R. 1992). Therefore, the figures recited above, insofar as they pertain to the JDD and DLP, are minimum estimates. B. Ordinary Costs. B. Ordinary Costs. ______________ Presumably, the payments made pursuant to the cost- sharing orders, though substantial, do not comprise the whole of appellants' investment in this sprawling litigation. Their successful defense doubtless required other, more commonplace expenditures, such as photocopy costs of the type and kind routinely associated with litigation. See, e.g., 28 U.S.C. ___ ____ 1920 (1988) (listing fees and expenses taxable as costs). III. WAIVER III. WAIVER Having described the expenses appellants seek to recoup, we pause to address a threshold matter. The plaintiffs submit that the pre-fire insurers waived any claim for expense ____________________ 6The DLP was responsible for receiving, on behalf of all defendants, and disseminating, among all defense counsel, court orders and discovery materials. See Pretrial Order No. 127, at ___ 62-63. 7 recovery by failing to file bills of costs after judgment entered. See id. (requiring bill of costs to be filed). We ___ ___ demur: the doctrine of waiver presents no barrier to appellants' attempt to recover court costs or request a reallocation of the mandatory cost-sharing assessments. To be sure, the failure seasonably to file a bill of costs with the district court may, in certain circumstances, constitute a waiver of a party's right to recoup costs under Rule 54(d). See Mason v. Belieu, 543 F.2d 215, 222 (D.C. Cir.) ___ _____ ______ (vacating a cost award where plaintiffs had failed to file a bill of costs), cert. denied, 429 U.S. 852 (1976). There is no waiver _____ ______ here, however, because the district court, by ordering, coincident with the entry of judgment, that each party bear its own costs, preempted appellants' opportunity to file a bill of costs and did so despite D.P.R. Loc. R. 331.1, which allows prevailing parties ten days after notice of judgment to file bills of costs. In the face of this flat ruling, the subsequent filing of an itemized bill of costs would have served no useful purpose.7 The law does not require litigants to run fools' errands. Thus, a party who forgoes an obviously futile task will not ordinarily be held thereby to have waived substantial rights. See Franki Found. Co. v. Alger-Rau & Assocs. Inc., 513 F.2d 581, ___ _________________ _________________________ ____________________ 7Similarly, given the clarity and definiteness of the trial court's order, a post-trial motion for reconsideration was not required as a condition precedent to taking an appeal. See ___ Sherrill v. Royal Indus., Inc., 526 F.2d 507, 509 n.2 (8th Cir. ________ __________________ 1975); Franki Found. Co. v. Alger-Rau & Assocs. Inc., 513 F.2d _________________ _________________________ 581, 587 (3d Cir. 1975). 8 587 (3d Cir. 1975) (refusing to allow waiver to be grounded in a party's dereliction of a futile task); see also Northern Heel ___ ____ _____________ Corp. v. Compo Indus., Inc., 851 F.2d 456, 461 (1st Cir. 1988) _____ ___________________ (stating, in a different context, that "[t]he law should not be construed idly to require parties to perform futile acts or to engage in empty rituals"). A somewhat closer question is whether appellants, by failing to ask the district court, after judgment entered, to readjust the mandatory assessments, thereby waived the right to raise that issue here. We hold they have not. Our decision is largely pragmatic. There is no rule specifically limiting the time within which a party may make a request for an order reallocating case-management expenses. Cf. White v. New ___ _____ ___ Hampshire Dep't of Employment Sec., 455 U.S. 445, 455 (1982) ____________________________________ (holding that no general federal rule governs the timing of post- judgment motions for attorneys' fees under 42 U.S.C. 1988). Should we refuse to entertain the issue, appellants would presumably return to the district court and formally request a reallocation. Thus, as a practical matter, to abstain from considering the issue now would only prolong an already protracted litigation. To the extent that an issue is one of law rather than fact, can be resolved without doubt on the existing record, and is likely to arise in other cases, an appellate court may, in the interests of justice, choose to overlook a procedural default. See Singleton v. Wulff, 428 U.S. 106, 121 (1976); ___ _________ _____ United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir. 1990). _____________ __________ 9 Here, we think it best to exercise our discretion, meet the problem head-on, and excuse appellants' failure to move for reallocation below. IV. ANALYSIS IV. ANALYSIS We turn now to the meat of the consolidated appeals. Appellants ask us to order that they be afforded a fair opportunity to recover their court costs and cost-sharing assessments either under Fed. R. Civ. P. 54(d) or under some other source of judicial power. We address these alternatives separately. A. Rule 54(d). A. Rule 54(d). __________ Appellants assert that the district court's unexplained denial of costs constituted an abuse of discretion. Because they prevailed on all claims below, their thesis runs, they are presumptively entitled to recover their costs of suit under Fed. R. Civ. P. 54(d) and these include the mandatory assessments. In order to evaluate this multifaceted contention, we first review the general operation of Rule 54(d), elucidating, in particular, the leeway it gives trial courts to grant or deny costs to prevailing parties. We then analyze the rule's implications in the context of this case. 1. General Operation. Congress has enumerated the 1. General Operation. __________________ type of expenses that a federal court "may tax as costs." 28 U.S.C. 1920.8 Rule 54(d) works in tandem with the statute. ____________________ 8The section provides: A judge . . . may tax as costs the following: 10 It provides, with exceptions not pertinent here, that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d). The combined effect of the statute and rule is to cabin district court discretion in two ways. First, section 1920 has an esemplastic effect. It fills the void resulting from Rule 54(d)'s failure to define the term "costs," see Crawford Fitting Co. v. J. T. Gibbons, Inc., ___ _____________________ ____________________ 482 U.S. 437, 441 (1987) (holding that "[section] 1920 defines the term `costs' as used in Rule 54(d)"), and in that way constrains the district court's power to determine which expense categories constitute taxable costs. In other words, the statute and rule, read together, signify that a district court lacks the ability to assess "costs" under Rule 54(d) above and beyond those that come within the statutory litany. See id. ___ ___ In light of the foregoing, we conclude that Rule 54(d) confers no discretion on federal courts independent of the ____________________ (1) Fees of the clerk and marshal; (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and copies of papers necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters . . . and costs of special interpretation services . . . . 28 U.S.C. 1920. 11 statute to tax various types of expenses as costs. See id.; ___ ___ accord Denny v. Westfield State College, 880 F.2d 1465, 1468 (1st ______ _____ _______________________ Cir. 1989) (reasoning that, in light of Crawford, Rule 54(d) does ________ not constitute a separate source of judicial discretion); Freeman _______ v. Package Mach. Co., 865 F.2d 1331, 1346 (1st Cir. 1988) ___________________ (similar). Rather, the discretion that Rule 54(d) portends is solely a negative discretion, "a power to decline to tax, as ________ costs, the items enumerated in 1920." Crawford, 482 U.S. at ________ 442; accord Rodriguez-Garcia v. Davila, 904 F.2d 90, 100 (1st ______ ________________ ______ Cir. 1990). We further believe that this negative discretion the power to deny recovery of costs that are categorically eligible for taxation under Rule 54(d) operates in the long shadow of a background presumption favoring cost recovery for prevailing parties. This presumption emanates from the rule's language: "costs shall be allowed as of course." Notwithstanding that the rule permits a nisi prius court to deviate from this baseline, ____ _____ see, e.g., Phetosomphone v. Allison Reed Group, Inc., 984 F.2d 4, ___ ____ _____________ ________________________ 9 (1st Cir. 1993); Heddinger v. Ashford Memorial Community Hosp., _________ ________________________________ 734 F.2d 81, 86 (1st Cir. 1984); Emerson v. National Cylinder Gas _______ _____________________ Co., 251 F.2d 152, 158 (1st Cir. 1958), awarding costs to a ___ prevailing party is the norm. See Delta Air Lines, Inc. v. ___ _______________________ August, 450 U.S. 346, 352 (1981) (stating that "prevailing ______ plaintiffs presumptively will obtain costs under Rule 54(d)"); Crossman v. Marcoccio, 806 F.2d 329, 331 (1st Cir. 1986) ________ _________ (observing that Rule 54(d) "generally permits prevailing parties 12 to recover their costs"), cert. denied, 481 U.S. 1029 (1987); _____ ______ Castro v. United States, 775 F.2d 399, 410 (1st Cir. 1985) ______ ______________ (noting that a prevailing party "ordinarily is entitled" to recoup the costs enumerated in section 1920). This presumption, then, constitutes the second constraint on a district court's ability to freewheel in the Rule 54(d) environment. After all, it is difficult to dispute the proposition that a court's discretion in implementing a rule which articulates a norm is more confined than a court's discretion in applying a nondirective rule. See White & White, ___ _______________ Inc. v. American Hosp. Supply Corp., 786 F.2d 728, 731-32 (6th ____ ____________________________ Cir. 1986); Coyne-Delany Co. v. Capital Dev. Bd., 717 F.2d 385, ________________ ________________ 392 (7th Cir. 1983). Beyond the presumption favoring cost recovery for prevailing parties, there is also fairly general agreement that a district court may not exercise its discretion to disallow a prevailing party's bill of costs in whole or in part without articulating reasons. See Schwarz v. Folloder, 767 F.2d 125, 131 ___ _______ ________ (5th Cir. 1985); Gilchrist v. Bolger, 733 F.2d 1551, 1557 (11th _________ ______ Cir. 1984); Baez v. United States Dep't of Justice, 684 F.2d 999, ____ ______________________________ 1004 & n.28 (D.C. Cir. 1982) (collecting cases from ten circuits). The Sixth Circuit has gone so far as to catalogue the justifications that it deems acceptable and unacceptable for denying costs in the Rule 54(d) milieu. See White & White, 786 ___ _____________ 13 F.2d at 730.9 In the Seventh Circuit, costs may be denied only when the losing party is indigent or "there has been some fault, misconduct, default, or other action worthy of penalty" on the winner's side. Burroughs v. Hills, 741 F.2d 1525, 1542 (7th Cir. _________ _____ 1984), cert. denied, 471 U.S. 1099 (1985). _____ ______ To the present, this court has been more muted both about a district judge's duty to explain a denial of costs and about the reasons that may warrant such a denial.10 In addressing those subjects today, we stop short of requiring district courts to state reasons or make elaborate findings in every case when acting under Rule 54(d). Instead, we hold that, if the basis for denying costs is readily apparent on the face of the record, a trial court need not explain its action merely for explanation's sake.11 If, however, the situation is less than ____________________ 9The White & White court articulated four circumstances in ______________ which it believed costs might be denied (the taxable expenditures are unnecessary or unreasonably large; the prevailing party needlessly prolonged the proceedings; a prevailing plaintiff's recovery is so insignificant that his or her victory amounts to a defeat; the issues prove to be close and difficult), two circumstances that a district court must ordinarily ignore (the jury's seeming generosity; the prevailing party's ability to pay his or her own costs), and two circumstances which, though relevant, are insufficient, standing alone, to warrant an exercise of negative discretion (a losing party's good faith; the propriety with which the loser conducted the litigation). See ___ White & White, 786 F.2d at 730. _____________ 10We have, however, reversed a district court's denial of costs to a prevailing party when the court neglected to furnish any valid explanation for the denial. See Templeman v. Chris ___ _________ _____ Craft Corp., 770 F.2d 245, 249 (1st Cir.), cert. denied, 474 U.S. ___________ _____ ______ 1021 (1985). 11Although we do not impose an absolute duty to set forth findings in all cases, we remind the district courts that "reasonably complete findings at the trial court level invariably 14 obvious, the court must offer some statement as to why it denied statutory costs to a prevailing party. Adopting this rule balances the need for findings against the proliferation of busywork that threatens to inundate the district courts. It also parallels an approach that has served us well in analogous contexts. See, e.g., Foster v. Mydas ___ ____ ______ _____ Assocs., Inc., 943 F.2d 139, 141-43 (1st Cir. 1991) (reaffirming, _____________ in the context of both 42 U.S.C. 1988 and Fed. R. Civ. P. 11, that a district court, absent a readily apparent basis, must articulate the reasons undergirding a fee award); Figueroa-Ruiz _____________ v. Alegria, 905 F.2d 545, 549 (1st Cir. 1990) ("While we do not _______ hold that the district court must make findings and give explanations every time a party seeks sanctions under Rule 11, we do require a statement when the reason for the decision is not obvious or apparent from the record."); Figueroa-Rodriguez v. __________________ Lopez-Rivera, 878 F.2d 1488, 1491 (1st Cir. 1988) (discussing the ____________ need for findings when the reasons for invoking Fed. R. Civ. P. 16(f)'s sanction provisions are less than evident). 2. Application. Our overview completed, we now apply 2. Application. ___________ Rule 54(d) to the facts of this case. Appellants argue that the district court erred by summarily precluding an award of costs under Rule 54(d) without explanation and without even entertaining a bill of costs. We think the contention has partial merit. ____________________ facilitate the appellate task." United States v. De Jesus, 984 _____________ _________ F.2d 21, 22 n.4 (1st Cir. 1993). 15 a. a. __ To the extent that the district court's order prevents appellants from reclaiming their mandatory cost-sharing assessments through the medium of Rule 54(d), we discern no error. As evidenced by the record, these payments were primarily directed into the operating budgets of the JDD and DLP. In a prior ruling, the district court explained that the assessments helped subsidize such general overhead expenses as rent, utilities, telephone charges, and staff salaries. See Hotel Fire ___ __________ Litig., 142 F.R.D. at 46 & n.19. We agree with Judge Acosta that ______ 28 U.S.C. 1920 does not identify "[t]hese general litigation expenses . . . as taxable." Id. at 46; see also Wahl v. Carrier ___ ___ ____ ____ _______ Mfg. Co., 511 F.2d 209, 217 (7th Cir. 1975) (disallowing similar _________ overhead expenses); 6 James W. Moore et al., Moore's Federal ________________ Practice 54.77[8], at 54-480 (2d ed. 1993) (stating that ________ "general overhead expense[s] . . . are not costs within [section 1920] and Rule 54(d)"). Nor can parties dissect case-management assessments in an attempt to trace every last penny and thereby attribute fractional shares to expenses which, if freely incurred by an individual litigant, might qualify as taxable costs. We will not paint the lily. Rule 54(d) cannot be stretched beyond the parameters defined in section 1920. See ___ Denny, 880 F.2d at 1468; Templeman v. Chris Craft Corp., 770 F.2d _____ _________ _________________ 245, 249-50 (1st Cir.), cert. denied, 474 U.S. 1021 (1985); Bosse _____ ______ _____ v. Litton Unit Handling Sys., 646 F.2d 689, 695 (1st Cir. 1981). _________________________ Accordingly, district courts possess no authority under Rule 16 54(d) to tax as costs case-management charges of a type or kind unenumerated in 28 U.S.C. 1920, including, without limitation, general overhead expenses paid pursuant to case-management orders in mass disaster litigation. It follows inexorably that the court below correctly treated these expenditures as lying outside the stunted reach of Rule 54(d). b. b. __ The district court's September 11, 1992 final judgment regarding the claims against the pre-fire insurers also barred recovery of any ordinary costs incurred by appellants. The district court gave no explanation for its curt preclusion of taxable costs, and none is evident from the record. Moreover, by acting in so peremptory a manner, the court foreclosed appellants from requesting ordinary costs in the ordinary fashion. See ___ generally D.P.R. Loc. R. 331.1 (allowing prevailing party ten _________ days from entry of judgment in which to file a verified bill of costs). On this record, we think that the district court abused its discretion by depriving appellants of an opportunity to seek ordinary costs, presumptively taxable under Rule 54(d), without a word of explanation.12 c. c. __ To sum up, Rule 54(d) provides appellants only limited comfort; upon the filing of bills of costs, the pre-fire insurers ____________________ 12Appellants indicate that they incurred some taxable photocopy expenses. See generally Rodriguez-Garcia, 904 F.2d at ___ _________ ________________ 100 (holding certain photocopying expenses recoverable under Rule 54(d)). We have adequate reason to believe that they may also have incurred other expenses taxable as costs. 17 will recover any itemized expenses that are statutorily allowable, unless the district court offers a sound reason for denying costs. However, to the extent that appellants invoke the rule as a means of retrieving the big-ticket items that constitute the centerpiece of these appeals the court-ordered cost-sharing assessments they are fishing in an empty stream. B. Reallocation of Court-Ordered Assessments. B. Reallocation of Court-Ordered Assessments. _________________________________________ Appellants also argue that, even if the mandatory assessments fall outside Rule 54(d)'s domain, they may still be reallocated. This asseveration supposes a federal court power, unrelated to Rule 54(d), to redistribute, after judgment, an initial division of discovery expenses among all parties, despite the absence of an explicit reservation of the right to do so. We think appellants' premise is sound. We hold that a district court possesses the authority to reallocate court- imposed case-management expenses if, in the exercise of its considered judgment, it determines that equity and the interests of justice so require. In the sections that follow, we trace the derivation of that power, propose broad guidelines for its use, and discuss what remains to be done in this instance. 1. Source of Power. The exigencies of complex, 1. Source of Power. _________________ multidistrict litigation change the ordnance with which courtroom battles are fought. Traditional procedures for serving papers and gathering information must often give way to innovations promoting economy and efficiency. See Manual for Complex ___ ____________________ Litigation 20.22, at 15 (2d ed. 1985). Moreover, the sheer __________ 18 number of parties and issues produces a "critical need for early, active involvement by the judiciary." Id. 20.1, at 5. To ___ facilitate this involvement, explicit grants of authority contained in the Civil Rules, which supplement the trial court's inherent power to manage litigation, "enable the judge to exercise substantial control and supervision over the conduct of the litigation." Id. at 6. ___ Recent amendments to the Civil Rules have augmented the trial judge's arsenal of case-management weapons. For example, the 1983 overhaul of Rule 16 "encourage[s] pretrial management that meets the needs of modern litigation." Fed. R. Civ. P. 16 advisory committee's notes. The drafters thought that cases would be disposed of "more efficiently and with less cost and delay" if "a trial judge intervene[s] personally at an early stage to assume judicial control over a case." Id.; see also ___ ___ ____ Figueroa-Rodriguez, 878 F.2d at 1490 (acknowledging that in a __________________ time "of increasingly complicated cases and burgeoning filings, judges must have at their fingertips smooth-running, productive machinery for conducting litigation and managing caseloads"). In this multidistrict litigation, involving upward of 2000 parties and raising a googol of issues, Judge Acosta's power to mandate contributions to, inter alia, a central discovery _____ ____ depository can scarcely be doubted. See Recticel, 859 F.2d at ___ ________ 1001, 1004; see also David F. Herr, Multidistrict Litigation ___ ____ _________________________ 9.7.3, at 205 (1986) (recognizing "the potential use of a document depository as a means of facilitating efficiency"). 19 While no procedural rule directly addresses pretrial cost-sharing orders per se, Rule 26(f) expressly authorizes trial judges, ___ __ following discovery conferences, to enter orders for "the allocation of expenses[] as are necessary for the proper management of discovery." Fed. R. Civ. P. 26(f).13 We believe that this rule is flexible enough to serve as the source of judicial authority for imposing cost-sharing orders in complex cases.14 The expense allocation orders Rule 26(f) authorizes "may be altered or amended whenever justice so requires." Fed. R. Civ. P. 26(f). For that reason, as well as on the basis of common sense, a trial judge's power to promulgate cost-sharing orders must carry with it the power to readjust such orders as changed circumstances require. Indeed, in denying a petition for mandamus addressed to the propriety of the very cost-sharing orders here at issue, we acknowledged the district court's power to "reshape and refashion its cost-sharing orders as new information comes to light, or as information already known takes on added significance." Recticel, 859 F.2d at 1004. We reaffirm ________ ____________________ 13Fed. R. Civ. P. 26(f) was adopted in 1980 in the hope that judicial intervention would curb discovery abuse. See Fed. R. ___ Civ. P. 26(f) advisory committee's notes. Among other things, the rule interjects the trial court in developing "a reasonable program or plan for discovery." Id. ___ 14This court has already remarked the striking similarity between ordinary discovery orders and the case-management orders that Judge Acosta tailored for use in this litigation. See ___ Recticel, 859 F.2d at 1002-03. ________ 20 this message today,15 confident that our reading of Rule 26(f) does not loose some strange new beast to prey on unsuspecting litigants. In the last analysis, a district court's intrinsic power to alter its own directives is a familiar one, applicable to many other sorts of pretrial orders. See, e.g., Poliquin v. ___ ____ ________ Garden Way, Inc., ___ F.2d ___, ___ (1st Cir. 1993) [Nos. 92- _________________ 1115, 92-1116, slip op. at 20] (noting that pretrial protective orders are "always subject to the inherent power of the district court to relax or terminate the order, even after judgment"). Consequently, we hold that, despite the absence of any language in a cost-sharing order reserving a trial judge's right to rearrange the burdens therein imposed at a later date, "it is certain beyond peradventure that [a] district court can . . . entertain motions for the reallocation of expenses." Recticel, ________ 859 F.2d at 1004-05. This power is the logical (and, we think, necessary) extension of the court's authority to fashion pretrial cost-sharing orders in the first place. To say that the power to reallocate assessments under cost-sharing orders can fairly be implied from the Civil Rules is ____________________ 15While we emphasize that the power we describe here is an implied power derived from the Civil Rules, we note that the Supreme Court has, in limited circumstances, sanctioned federal court resort to an intrinsic power analogous to its statutory prerogative to assess costs and attorneys' fees. See Chambers v. ___ ________ NASCO, Inc., 111 S. Ct. 2123, 2133 (1991) (discussing federal ____________ courts' inherent power to shift fees in certain circumstances); Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, ___________________________ _________________ 258-59 (1975) (similar). Be that as it may, we need not decide today whether, apart from the power derived from the Civil Rules, a district court possesses the inherent power to effectuate reallocation of cost-sharing assessments previously imposed. 21 not to say that the district court's exercise of that power is unbridled. In our view, the power is coupled with an interest in fairness and its exercise must, therefore, comport with first principles of equity. It is to this unexplored terrain that we now turn. 2. The Standards Governing Reallocation. Although 2. The Standards Governing Reallocation. _____________________________________ cost-sharing orders are sui generis, they almost always ___ _______ constitute a way of fueling an array of hand-crafted procedural devices designed to sort and resolve myriad claims in an equitable, efficient, comparatively inexpensive manner. A subsequent decision to readjust the burdens imposed by such orders, and the specific redistribution that results, must remain faithful to that aim.16 The power to readjust, then, must be exercised in accordance with a set of equitable principles, shaped by the circumstances indigenous to the litigation but rooted in the concept that court-imposed burdens should, in the end, balance derived benefits. In the paragraphs that follow, we touch lightly upon certain fundamental principles that should inform the determination of whether a post-judgment reallocation of court-ordered expenses is advisable, and if so, to what ____________________ 16We limit our discussion to cases where, as here, mandatory cost-sharing orders are largely silent on the matter of an eventual redistribution of expenses. A district court may, of course, build into a cost-sharing order a mechanism for eventual redistribution, the structure and propriety of which would have to be considered on its own merits against the backdrop of the particular litigation. Indeed, the court below formulated such a mechanism, but limited its operation to cost-sharing assessments levied against plaintiffs' attorneys. See Pretrial Order No. ___ 127, at 39-40; see also supra note 2. ___ ____ _____ 22 extent. a. a. __ Upon motion, a district court should consider reallocating costs after entry of judgment when, with the acuity of hindsight, it determines that a party or group of parties has significantly failed to derive the expected benefits from burdens imposed under cost-sharing orders entered earlier in the litigation, or has derived those benefits to a significantly greater or lesser extent than other similarly situated parties. This rule dominates the constellation of factors bearing on the decision to reallocate. b. b. __ In contrast to the well-recognized presumption that prevailing parties should recover their taxable costs under Rule 54(d), there is no basis for a parallel presumption that the winners' case-management expenses should be borne by the losers. Thus, a prevailing party will not automatically receive a favorable reallocation, but must persuade the court of an entitlement to one. This conclusion flows naturally from the idea that derived benefit is the shining star in the readjustment galaxy: when all is said and done, the benefit a party secures from forced contributions to joint ventures in complex litigation may be unrelated, or vastly disproportionate, to the party's success on the merits. c. c. __ To say that prevailing parties are not presumptively 23 entitled to a favorable reallocation of cost-sharing assessments is not to say that either the fact or the scope of a litigant's victory is irrelevant to a district court's reassessment of the matter. The inherent clarity of a case and the ease with which it can be decided without resort to heroic measures ordinarily affect the degree of benefit the prevailing party obtains from the availability of innovative procedural mechanisms. Hence, the extent to which a litigant achieves a swift, across-the-board success not correlated with case-management tools must necessarily inform the district court's reallocation decision. The presence of knotty issues, fought, in the Stalingrad tradition, from rock to rock and tree to tree, often cuts the other way. Close cases, particularly those that are fact- dominated, tend to be cases in which all parties derive considerable benefit from the availability of sophisticated case- management tools. d. d. __ When a district court considers a party's request to reallocate sums previously assessed, the requestor's ability to shoulder the expense is immaterial. Cost-sharing orders are attempts to distribute systemic costs in an equitable manner; they should not be transmogrified into a method of forcing deep pockets, whenever and for whatever reason they appear in a suit, to bear the crushing financial burdens of complex litigation. Equity in readjusting cost-sharing orders depends upon who, in the end, garnered a disproportionate slice of the benefits the 24 orders sought to provide, not upon who can best afford to pay.17 Although the operative considerations are not entirely the same, this principle parallels the Sixth Circuit's longstanding view that a prevailing party's ability to pay his or her own costs is an improper basis for refusing to tax costs against the loser under Rule 54(d). See White & White, 786 F.2d ___ _____________ at 730; Lewis v. Pennington, 400 F.2d 806, 819 (6th Cir.), cert. _____ __________ _____ denied, 393 U.S. 983 (1968). ______ e. e. __ Cost-sharing orders are designed to inure to the benefit of all contributing parties. A case's history and particular circumstances may reveal that some parties carried heavy, even excessive, loads, while other parties enjoyed a relatively free ride. Reallocating cost-sharing assessments affords a way of balancing case-specific inequities. For example, a party's interjection of unmeritorious issues that unnecessarily lengthen the litigation might favor the conclusion that others have paid too much and the interjector has paid too ____________________ 17We recognize that the presence of an indigent party may affect the reallocation decision. Cf., e.g., Neitzke v. ___ ____ _______ Williams, 490 U.S. 319, 324 (1989) (discussing Congress's desire ________ to "ensure that indigent litigants have meaningful access to the federal courts"); Adkins v. E. I. DuPont de Nemours & Co., 335 ______ _______________________________ U.S. 331, 339 (1948) (refusing to require litigants "to contribute to payment of costs[] the last dollar they have or can get" before becoming entitled to forma pauperis standing); _____ ________ Aggarwal v. Ponce Sch. of Medicine, 745 F.2d 723, 728 (1st Cir. ________ _______________________ 1984) (warning that courts must go slowly in allowing "toll- booths [to] be placed across the courthouse doors"); Burroughs, _________ 741 F.2d at 1542 (allowing a district court to deny costs under Rule 54(d) when the losing party is indigent). We do not probe the point, however, because no party involved in these appeals has asserted such a claim. 25 little. Cf. Lichter Found., Inc. v. Welch, 269 F.2d 142, 146 ___ _____________________ _____ (6th Cir. 1959) (approving denials of costs to prevailing parties under Rule 54(d) on this basis). A cost-readjustment analysis, like all decisions grounded in equity, must leave room for such case-specific factors. f. f. __ We believe that we have said enough to erect a flexible framework for reallocation analysis and, hopefully, to provide a modicum of general guidance to the district courts. We caution that the relative weight and impact of relevant considerations will vary from situation to situation, and, moreover, that, given the virtually limitless number of permutations likely to be encountered in civil litigation, our compendium of factors is not all-encompassing. 3. Remedy. The question of remedy remains. It is 3. Remedy. ______ clear that an appellate court is not the most propitious forum for shaking up a preexisting expense allocation. By definition, cost-sharing orders originate with the district court as a component of the court's case-management function. Given the district judge's intimate knowledge of the circumstances under which the imposts were conceived, his familiarity with the nature and purposes of the assessments, his front row seat throughout the litigation, and his matchless ability to measure the benefits and burdens of cost-sharing to the parties in light of the litigation's progress and stakes, we are convinced that the district judge has the coign of vantage best suited to 26 determining, in the first instance, whether, and if so, how, the initial cost-sharing orders should be modified. We are keenly aware that this litigation has exhibited a capacity to chew up endless amounts of judicial resources and we are extremely reluctant to prolong matters. Here, however, the necessity for remanding is plain: not only is the trial judge best equipped to address the remaining problems, but also, as we explain below, there is at least a prima facie case for some reallocation of the _____ _____ assessments. Indeed, the collocation of circumstances strongly suggests that the pre-fire insurers did not reap in full the benefits associated with several of the procedural innovations they helped to fund. We run the gamut. More than half of each appellant's assessment supplemented the budgets of the JDC and JDD, facilities devoted to the economical coordination and speedy completion of discovery. Because the pre-fire insurers defeated all adverse claims through dispositive motions short of trial, on purely legal grounds, the benefit they derived from these innovations was most likely minimal. The near-complete closure of discovery prior to appellants' appearance in the litigation, see supra p. 4 ___ _____ & note 3, rendered the JDC, established to stimulate expeditious resolution of discovery disputes, of dubious value to appellants. As for the JDD, the documents housed there were of questionable relevance vis-a-vis appellants because they were gathered during earlier litigation phases that settled a host of different issues. To be sure, appellants probably derived some benefit 27 from the facilities they helped to fund. Certainly, they were free to peruse whatever useful evidence the JDD did contain.18 What is more, the DLP presumably facilitated the movement of papers to appellants' behoof; and appellants probably saved money through the avoidance of unnecessary duplication. But, it is difficult to fathom how contributions on a par with those of all other defendants to fact gathering largely irrelevant to the claims against appellants constituted the "most efficient use of . . . [appellants'] resources." Pretrial Order No. 127, at i. The early stage at which the district court dismissed all claims against appellants also creates doubt as to whether the substantial assessments, geared largely toward efficient fact gathering, inured to appellants' benefit to any meaningful degree. The pre-fire insurers prevailed on all claims, as a matter of law, without going to trial. The district court, having determined that no issue of fact needed debate and that appellees' arguments had no basis in law, see Hotel Fire Litig., ___ _________________ 802 F. Supp. at 635, 644, might be hard-pressed to conclude that appellants' huge expenditures, diverted to facilities designed, in large part, to collect, sort, and maintain factual documents, were integral to, or even marginally connected with, the pursuit of their cause. In sum, it appears from the record before us that appellants have a colorable basis for arguing that they derived ____________________ 18Nevertheless, thirteen appellants contend that they utilized no evidence contained in the JDD to support their __ dispositive motions. 28 minimal benefits from the assessments. Nonetheless, this hypothesis remains unproven. There may be more here than meets the eye; for one thing, the appellate record does not speak in any detail to the equities. Although an appellate court may decline to remand where remanding would be an empty exercise, see, e.g., Societe des Produits Nestle, S.A. v. Casa Helvetia, ___ ____ __________________________________ ______________ Inc., 982 F.2d 633, 642 (1st Cir. 1992) (declining to remand ____ where, once the court of appeals decided the correct rule of law, the district court's preexisting findings of fact rendered the result obvious), that is not the case here. Rather, there are pregnant questions to be mulled on remand questions on which the trial judge's viewpoint is especially important. We conclude, therefore, that the case must be returned to the district court for further proceedings before Judge Acosta. We intimate no opinion as to the appropriate outcome of those proceedings. V. BANKRUPTCY OF AN AFFILIATED ENTITY V. BANKRUPTCY OF AN AFFILIATED ENTITY We are not yet at journey's end. Two appellees, Associates and HSI, invoke the so-called automatic stay provision, 11 U.S.C. 362 (1988), in an endeavor to persuade us that an affiliated firm's bankruptcy should have resulted in a stay of proceedings on appeal. We are not convinced. The essential facts are as follows. On August 5, 1991, Holders Capital Corporation (HoCap) filed for bankruptcy. Because HSI is a wholly owned subsidiary of HoCap and Associates is a limited partnership whose general partner is also a wholly 29 owned subsidiary of HoCap, both appellees assert that continued prosecution of the pre-fire insurers' appeals, as against them, constitutes an impermissible attempt to obtain possession of the debtor's property in violation of 11 U.S.C. 362(a)(3). This assertion need not detain us. As a general rule, section 362(a)'s automatic stay provisions apply only to the debtor in bankruptcy. See Austin v. Unarco Indus., Inc., 705 ___ ______ ____________________ F.2d 1, 4 (1st Cir.), cert. dismissed, 463 U.S. 1247 (1983); see _____ _________ ___ generally _________ In re Western Real Estate Fund, Inc., 922 F.2d 592, 600 (10th ______________________________________ Cir. 1990), modified on other grounds, 932 F.2d 898 (10th Cir. ________ __ _____ _______ 1991). As entities legally distinct from HoCap, see Parkview- ___ _________ Gem, Inc. v. Stein, 516 F.2d 807, 811 (8th Cir. 1975) (holding _________ _____ that where debtor, qua lessee, had previously assigned all ___ leasehold rights to a subsidiary, the lessor's action to terminate the lease could not be enjoined because, despite the fact that the termination would likely have "an adverse [e]ffect upon the debtor," no claim was asserted against the debtor); In __ re Bank Ctr., Ltd., 15 B.R. 64, 65 (Bankr. W.D. Pa. 1981) ____________________ (refusing to stay an action against the partner of a bankrupt partnership because a "partner is a separate entity from the partnership"), the two corporate appellees are not presumptively entitled to the protection of any automatic stay which may be extant in the HoCap bankruptcy proceeding. Since these appeals implicate no attempt to assert, enforce or recover any claim against HoCap or its property, the appeals may proceed. 30 See 11 U.S.C. 362(a)(3) (staying actions to "obtain possession ___ of" or "exercise control over" the bankrupt estate); see also ___ ____ Fragoso v. Lopez, F.2d , (1st Cir. 1993), [No. 92- _______ _____ ____ ____ ____ 2046, slip op. at 14] (noting federal court reluctance to refrain from "deciding legal issues pertaining to a party involved in a federal bankruptcy proceeding"); Picco v. Global Marine Drilling _____ ______________________ Co., 900 F.2d 846, 850 (5th Cir. 1990) ("The automatic stay of ___ the bankruptcy court does not divest all other courts of jurisdiction to hear every claim that is in any way related to the bankruptcy proceeding."). VI. CONCLUSION VI. CONCLUSION We need go no further. We hold that the district court erred in precluding, without explanation, the taxation of ordinary costs under Rule 54(d) in favor of appellants (who were the prevailing parties). Hence, we remand to allow appellants an opportunity to file bills of costs in the usual form. The lower court did not err, however, in refusing to treat case-management expenditures as taxable costs within the purview of Rule 54(d) and its statutory helpmeet, 28 U.S.C. 1920. We also hold that the district court possesses the implied power, under Fed. R. Civ. P. 26(f), to revisit the initial allocations of case-management expenses and readjust the same as equity may require. Because the lower court did not afford appellants a fair opportunity to seek such a reallocation, we remand for that purpose as well. Appellants shall file their motions to reallocate with the district court no later than 31 thirty days from the date our mandate issues.19 Vacated and remanded; one-half costs to appellants. Vacated and remanded; one-half costs to appellants. __________________________________________________ UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ Nos. 92-2312 92-2313 IN RE: TWO APPEALS ARISING OUT OF THE SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION. _________________________ ____________________ 19In this connection we urge the district courts within this circuit to consider framing local rules to the effect that, henceforth, any application for reallocation of court-imposed cost-sharing expenses must be filed within thirty days of the entry of final judgment. Cf. White, 455 U.S. at 454 (observing ___ _____ that district courts are free "to adopt local rules establishing timeliness standards for the filing of claims for attorney's fees"); Obin v. District No. 9, Int'l Ass'n of Machinists & ____ _______________________________________________ Aerospace Workers, 651 F.2d 574, 583 (8th Cir. 1981) ___________________ (recommending a rule that claims for attorneys' fees must be filed within twenty-one days after entry of judgment). 32 APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Raymond L. Acosta, U.S. District Judge] ___________________ _________________________ Before Selya and Cyr, Circuit Judges, ______________ and Fuste,* District Judge. ______________ _________________________ Paul K. Connolly, Jr., with whom Damian R. LaPlaca, _______________________ __________________ LeBoeuf, Lamb, Leiby & MacRae, Ralph W. Dau, Peter B. Ackerman, ______________________________ ____________ __________________ Jeffrey W. Kilduff, O'Melveny & Myers, Raul E. Gonzalez-Diaz, ___________________ __________________ ______________________ A.J. Bennazar-Zequeira, Gonzalez & Bennazar, Andrew K. Epting, ______________________ ____________________ __________________ Jr., G. Trenholm Walker, Wise & Cole, Homer L. Marlow, William G. ___ __________________ ___________ _______________ __________ Liston, Marlow, Shofi, Connell, Velerius, Abrams, Lowe & Adler, ______ ________________________________________________________ Deborah A. Pitts, Hancock, Rothert & Bunshoft, Bethany K. Culp, ________________ ____________________________ ________________ Patrick McCoy, Oppenheimer Wolff & Donnelly, Lon Harris, Harris & _____________ ____________________________ __________ ________ Green, Stuart W. Axe, Lester, Schwab, Katz & Dwyer, Adrian _____ ______________ _______________________________ ______ Mercado, Mercado & Soto, Virgilio Mendez Cuesta, Ernesto _______ _________________ _________________________ _______ Rodriguez-Suris, and Latimer, Biaggi, Rachid, Rodriguez-Suris & _______________ ___________________________________________ Godreau were on consolidated briefs, for appellants. _______ Gary L. Bostwick, with whom R. Lance Belsome was on _________________ _________________ 33 brief, for appellees Hotel Systems International, et al. Alvaro Calderon, with whom Will Kemp and Monita F. ________________ _________ __________ Sterling, PSC Liaison, were on brief, for appellee Plaintiffs' ________ Steering Committee. _________________________ June 4, 1993 _________________________ _______________ *Of the District of Puerto Rico, sitting by designation. 34 SELYA, Circuit Judge. These consolidated appeals SELYA, Circuit Judge. ______________ require us to grapple for the first time with a looming problem in modern federal court practice: how, if at all, should expenses indigenous to a court's handling of mass disaster litigation be reallocated once the winners and losers have been judicially determined? Here, the appellants, late-joined defendants and defendants in cross-claim, prevailed in the underlying litigation. Nonetheless, the district court, coincident with the entry of judgment, effectively foreclosed them from either seeking costs under Fed. R. Civ. P. 54(d) or otherwise lobbying for reallocation of several hundreds of thousands of dollars in court-ordered expense assessments. Finding that the court's abrupt slamming of these doors was improvident, we vacate the relevant portion of the judgment and remand for further proceedings. I. BACKGROUND I. BACKGROUND In 1987, the Judicial Panel on Multidistrict Litigation appointed the Honorable Raymond L. Acosta, a United States District Judge for the District of Puerto Rico, to handle some 270 cases arising out of the deadly fire that had earlier engulfed the San Juan Dupont Plaza Hotel. See In re Fire ___ ____________ Disaster at Dupont Plaza Hotel, 660 F. Supp. 982 (J.P.M.L. 1987) _______________________________ (per curiam). Judge Acosta's stewardship proved "a model of judicial craftsmanship and practical ingenuity." In re Nineteen ______________ Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire _________________________________________________________________ Litig., 982 F.2d 603, 606 (1st Cir. 1992). Among the many ______ successful innovations that brought the litigation to a celeritous conclusion were (1) the creation of a Joint Document 35 Depository (JDD), which housed and copied for distribution all discovery materials, see Pretrial Order No. 127 (Dec. 2, 1988), ___ at 66; (2) the appointment of liaison counsels (plaintiffs' and defendants'), each of whom was responsible for dispersing filings among his or her constituents, see id. at 61-63; and (3) the ___ ___ formation of a Joint Discovery Committee (JDC) dedicated to devising means of expediting the litigation, see In re Recticel ___ ______________ Foam Corp., 859 F.2d 1000, 1001 (1st Cir. 1988) (describing ___________ operation of JDC). To fund these innovations, the district court entered a series of case-management orders which imposed mandatory assessments upon all litigants.20 In this way, the court periodically requisitioned fresh monies as funds on hand were depleted. The orders were silent as to (i) whether or not the court planned to readjust defendants' contributions in light of future developments, and (ii) the court's authority, if any, to effectuate such reallocations.21 ____________________ 20Because the mechanics of the allocation process are not critical for present purposes, we supply merely a thumbnail sketch. The Plaintiffs' Steering Committee (PSC) and the defendant San Juan Dupont Plaza Hotel Corporation were assessed a total of $100,000 to defray the JDD's start-up costs. See ___ Pretrial Order No. 127, at 69-70. Thereafter, each litigant paid for JDD-related services actually used. See id. at 70. To cover ___ ___ costs that were not offset by service charges (e.g., the JDD's ____ overhead expenses), the district court imposed mandatory assessments. Initially, at least, the PSC bore 15% of the incremental cost and the defendants, collectively, bore 85%. See ___ id. at 71. Within the defense collective, per-member assessments ___ were presumably equal. 21We add a small qualifier to this statement. Pretrial Order No. 127 is a document in excess of 200 pages dealing with a potpourri of matters. The portion of the order that discusses defendants' assessments does not address either of the two points mentioned in the text. However, in the portion of the document that addresses assessments imposed on plaintiffs' attorneys to fund the PSC and enable it to make its cost-sharing contributions, the district court provides for possible 36 Roughly two years after the first shots in the litigation had been fired, a group of defendants involved in the hotel's ownership and operation settled with the plaintiffs (the fire victims and their families) and cross-claimed for indemnification against various insurers whose liability policies had expired before the fire started (the pre-fire insurers). On August 9, 1989, the plaintiffs followed the cross-claimants' lead, adding the pre-fire insurers as direct defendants under P.R. Laws Ann. tit. 26, 2001, 2003 (1976). Because discovery had formally closed on December 15, 1988, see Pretrial Order No. ___ 127, at 96-97, the pre-fire insurers' investigation of the newly emergent claims against them necessarily centered around a review of documents stored in the JDD.22 The pre-fire insurers quickly filed dispositive motions. The district court, faced with more pressing problems, was slow in addressing the motions. Finally, the court granted them on September 11, 1992, see In re San Juan Dupont Plaza Hotel ___ _________________________________ Fire Litig., 802 F. Supp. 624 (D.P.R. 1992), aff'd, 989 F.2d 36 ___________ _____ (1st Cir. 1993), entered judgment in favor of the pre-fire ____________________ "reallocation of expenses based upon the actual, relative recovery" achieved by the various plaintiffs. Id. at 39. At the ___ very end of the document, the district court states that "[t]his Order may be either amended or modified by the Court sua sponte ___ ______ or upon good cause shown." Id. at 205. None of the parties ___ argue that either of the provisions we have identified relate to the possible reallocation of cost-sharing assessments levied against appellants (or any defendants, for that matter). And, none of the other orders contain any language, general or specific, similar to that which we have quoted. 22In one attempt to conduct some independent discovery, the pre-fire insurers moved to reopen discovery for ninety days. The docket sheet indicates that this motion was granted on March 19, 1991, albeit only for a three-day period. 37 insurers on all claims, and decreed that the parties would bear their own costs. On appeal, seventeen pre-fire insurers complain that the district court abused its discretion by summarily precluding both an award of costs and a complete or partial refund of the cost-sharing assessments.23 The fire victims, represented by the Plaintiffs' Steering Committee (PSC), and two cross- claimants, Hotel Systems International (HSI) and Dupont Plaza Associates (Associates), filed opposition briefs and participated in oral argument. II. NATURE OF THE STAKES II. NATURE OF THE STAKES In the expectation that describing the disputed expenditures in greater detail will help to put matters in the proper perspective, we travel that route. A. Court-Ordered Assessments. A. Court-Ordered Assessments. _________________________ The vast majority of appellants' outlays comprise mandatory payments imposed by six orders of the district court. See Pretrial Order No. 48 (Feb. 11, 1988); Pretrial Order No. 67 ___ (Apr. 18, 1988); Pretrial Order No. 127, supra; Pretrial Order _____ No. 135 (Jan. 17, 1989); Pretrial Order No. 212 (July 31, 1989); ____________________ 23The appellants are: Continental Insurance Company, Federal Insurance Company, First State Insurance Company, Granite State Insurance Company, Highlands Insurance Company, Industrial Underwriters Insurance Company, International Insurance Company, Landmark Insurance Company, Protective National Insurance Company of Omaha, Puerto Rico American Insurance Company, Safety Mutual Casualty Corporation, St. Paul Fire & Marine Insurance Company, St. Paul Mercury Insurance Company, California Union Insurance Company, Central National Insurance Company of Omaha, Insurance Company of North America, and Pacific Employers Insurance Company. The latter four carriers filed a separate notice of appeal. Because the arguments are much the same, we treat the two appeals as a unit. 38 Order No. 259 (Aug. 21, 1990). Although the first four orders eventuated before appellants entered the fray, those orders required appellants to pay the sums assessed therein shortly after filing entries of appearance. See Pretrial Order No. 127, ___ at 71; Pretrial Order No. 135, at 9. Appellants paid the assessments under protest.24 The compulsory payments total $705,500. Eighty-three percent of this aggregate amount $586,500 represents assessments levied under the four earliest cost-sharing orders. Appellants' tribute helped to fund the various instrumentalities that Judge Acosta had set in place to expedite the litigation. Thus, out of each insurer's total contribution ($41,500), $18,000 went toward defraying the JDD's operating expenses, see Pretrial Order No. 127, at 72; $3,500 went toward ___ defraying the JDC's expenses, see id.; and $10,000 went toward ___ ___ paying costs associated with the office of Defendants' Liaison Person (DLP).25 See id.; Pretrial Order No. 212, at 1; Order ___ ___ No. 259, at 1. The district court originally intended that the remaining $10,000 would subsidize the construction of a new courtroom and related facilities. See Pretrial Order No. 135, at ___ 9. The idea was abandoned and the funds in question were ____________________ 24We fully understand appellants' submissiveness, inasmuch as refusal to pay would have resulted in sanctions, see Pretrial ___ Order No. 127, at 72; Pretrial Order No. 135, at 10, and this court had made no secret of its disinclination to review such orders prior to entry of final judgment. See Recticel, 859 F.2d ___ ________ at 1006. 25The DLP was responsible for receiving, on behalf of all defendants, and disseminating, among all defense counsel, court orders and discovery materials. See Pretrial Order No. 127, at ___ 62-63. 39 eventually utilized for operational costs of the JDD and DLP. See In re San Juan Dupont Plaza Hotel Fire Litig., 142 F.R.D. 41, ___ _____________________________________________ 46 n.20 (D.P.R. 1992). Therefore, the figures recited above, insofar as they pertain to the JDD and DLP, are minimum estimates. B. Ordinary Costs. B. Ordinary Costs. ______________ Presumably, the payments made pursuant to the cost- sharing orders, though substantial, do not comprise the whole of appellants' investment in this sprawling litigation. Their successful defense doubtless required other, more commonplace expenditures, such as photocopy costs of the type and kind routinely associated with litigation. See, e.g., 28 U.S.C. ___ ____ 1920 (1988) (listing fees and expenses taxable as costs). III. WAIVER III. WAIVER Having described the expenses appellants seek to recoup, we pause to address a threshold matter. The plaintiffs submit that the pre-fire insurers waived any claim for expense recovery by failing to file bills of costs after judgment entered. See id. (requiring bill of costs to be filed). We ___ ___ demur: the doctrine of waiver presents no barrier to appellants' attempt to recover court costs or request a reallocation of the mandatory cost-sharing assessments. To be sure, the failure seasonably to file a bill of costs with the district court may, in certain circumstances, constitute a waiver of a party's right to recoup costs under Rule 54(d). See Mason v. Belieu, 543 F.2d 215, 222 (D.C. Cir.) ___ _____ ______ (vacating a cost award where plaintiffs had failed to file a bill of costs), cert. denied, 429 U.S. 852 (1976). There is no waiver _____ ______ 40 here, however, because the district court, by ordering, coincident with the entry of judgment, that each party bear its own costs, preempted appellants' opportunity to file a bill of costs and did so despite D.P.R. Loc. R. 331.1, which allows prevailing parties ten days after notice of judgment to file bills of costs. In the face of this flat ruling, the subsequent filing of an itemized bill of costs would have served no useful purpose.26 The law does not require litigants to run fools' errands. Thus, a party who forgoes an obviously futile task will not ordinarily be held thereby to have waived substantial rights. See Franki Found. Co. v. Alger-Rau & Assocs. Inc., 513 F.2d 581, ___ _________________ ________________________ 587 (3d Cir. 1975) (refusing to allow waiver to be grounded in a party's dereliction of a futile task); see also Northern Heel ___ ____ ______________ Corp. v. Compo Indus., Inc., 851 F.2d 456, 461 (1st Cir. 1988) _____ __________________ (stating, in a different context, that "[t]he law should not be construed idly to require parties to perform futile acts or to engage in empty rituals"). A somewhat closer question is whether appellants, by failing to ask the district court, after judgment entered, to readjust the mandatory assessments, thereby waived the right to raise that issue here. We hold they have not. Our decision is largely pragmatic. There is no rule specifically limiting the time within which a party may make a request for an order reallocating case-management expenses. Cf. White v. New ___ _____ ___ ____________________ 26Similarly, given the clarity and definiteness of the trial court's order, a post-trial motion for reconsideration was not required as a condition precedent to taking an appeal. See ___ Sherrill v. Royal Indus., Inc., 526 F.2d 507, 509 n.2 (8th Cir. ________ __________________ 1975); Franki Found. Co. v. Alger-Rau & Assocs. Inc., 513 F.2d _________________ _________________________ 581, 587 (3d Cir. 1975). 41 Hampshire Dep't of Employment Sec., 455 U.S. 445, 455 (1982) ____________________________________ (holding that no general federal rule governs the timing of post- judgment motions for attorneys' fees under 42 U.S.C. 1988). Should we refuse to entertain the issue, appellants would presumably return to the district court and formally request a reallocation. Thus, as a practical matter, to abstain from considering the issue now would only prolong an already protracted litigation. To the extent that an issue is one of law rather than fact, can be resolved without doubt on the existing record, and is likely to arise in other cases, an appellate court may, in the interests of justice, choose to overlook a procedural default. See Singleton v. Wulff, 428 U.S. 106, 121 (1976); ___ _________ _____ United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir. 1990). _____________ __________ Here, we think it best to exercise our discretion, meet the problem head-on, and excuse appellants' failure to move for reallocation below. IV. ANALYSIS IV. ANALYSIS We turn now to the meat of the consolidated appeals. Appellants ask us to order that they be afforded a fair opportunity to recover their court costs and cost-sharing assessments either under Fed. R. Civ. P. 54(d) or under some other source of judicial power. We address these alternatives separately. A. Rule 54(d). A. Rule 54(d). __________ Appellants assert that the district court's unexplained denial of costs constituted an abuse of discretion. Because they prevailed on all claims below, their thesis runs, they are presumptively entitled to recover their costs of suit under Fed. 42 R. Civ. P. 54(d) and these include the mandatory assessments. In order to evaluate this multifaceted contention, we first review the general operation of Rule 54(d), elucidating, in particular, the leeway it gives trial courts to grant or deny costs to prevailing parties. We then analyze the rule's implications in the context of this case. 1. General Operation. Congress has enumerated the 1. General Operation. __________________ type of expenses that a federal court "may tax as costs." 28 U.S.C. 1920.27 Rule 54(d) works in tandem with the statute. It provides, with exceptions not pertinent here, that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d). The combined effect of the statute and rule is to cabin district court discretion in two ways. First, section 1920 has an esemplastic effect. It fills the void resulting from Rule 54(d)'s failure to define the term "costs," see Crawford Fitting Co. v. J. T. Gibbons, Inc., ___ _____________________ ____________________ ____________________ 27The section provides: A judge . . . may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and copies of papers necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters . . . and costs of special interpretation services . . . . 28 U.S.C. 1920. 43 482 U.S. 437, 441 (1987) (holding that "[section] 1920 defines the term `costs' as used in Rule 54(d)"), and in that way constrains the district court's power to determine which expense categories constitute taxable costs. In other words, the statute and rule, read together, signify that a district court lacks the ability to assess "costs" under Rule 54(d) above and beyond those that come within the statutory litany. See id. ___ ___ In light of the foregoing, we conclude that Rule 54(d) confers no discretion on federal courts independent of the statute to tax various types of expenses as costs. See id.; ___ ___ accord Denny v. Westfield State College, 880 F.2d 1465, 1468 (1st ______ _____ _______________________ Cir. 1989) (reasoning that, in light of Crawford, Rule 54(d) does ________ not constitute a separate source of judicial discretion); Freeman _______ v. Package Mach. Co., 865 F.2d 1331, 1346 (1st Cir. 1988) ___________________ (similar). Rather, the discretion that Rule 54(d) portends is solely a negative discretion, "a power to decline to tax, as ________ costs, the items enumerated in 1920." Crawford, 482 U.S. at ________ 442; accord Rodriguez-Garcia v. Davila, 904 F.2d 90, 100 (1st ______ ________________ ______ Cir. 1990). We further believe that this negative discretion the power to deny recovery of costs that are categorically eligible for taxation under Rule 54(d) operates in the long shadow of a background presumption favoring cost recovery for prevailing parties. This presumption emanates from the rule's language: "costs shall be allowed as of course." Notwithstanding that the rule permits a nisi prius court to deviate from this baseline, ____ _____ see, e.g., Phetosomphone v. Allison Reed Group, Inc., 984 F.2d 4, ___ ____ _____________ ________________________ 9 (1st Cir. 1993); Heddinger v. Ashford Memorial Community Hosp., _________ ________________________________ 44 734 F.2d 81, 86 (1st Cir. 1984); Emerson v. National Cylinder Gas _______ _____________________ Co., 251 F.2d 152, 158 (1st Cir. 1958), awarding costs to a ___ prevailing party is the norm. See Delta Air Lines, Inc. v. ___ _______________________ August, 450 U.S. 346, 352 (1981) (stating that "prevailing ______ plaintiffs presumptively will obtain costs under Rule 54(d)"); Crossman v. Marcoccio, 806 F.2d 329, 331 (1st Cir. 1986) ________ _________ (observing that Rule 54(d) "generally permits prevailing parties to recover their costs"), cert. denied, 481 U.S. 1029 (1987); _____ ______ Castro v. United States, 775 F.2d 399, 410 (1st Cir. 1985) ______ ______________ (noting that a prevailing party "ordinarily is entitled" to recoup the costs enumerated in section 1920). This presumption, then, constitutes the second constraint on a district court's ability to freewheel in the Rule 54(d) environment. After all, it is difficult to dispute the proposition that a court's discretion in implementing a rule which articulates a norm is more confined than a court's discretion in applying a nondirective rule. See White & White, ___ _______________ Inc. v. American Hosp. Supply Corp., 786 F.2d 728, 731-32 (6th ____ ____________________________ Cir. 1986); Coyne-Delany Co. v. Capital Dev. Bd., 717 F.2d 385, ________________ ________________ 392 (7th Cir. 1983). Beyond the presumption favoring cost recovery for prevailing parties, there is also fairly general agreement that a district court may not exercise its discretion to disallow a prevailing party's bill of costs in whole or in part without articulating reasons. See Schwarz v. Folloder, 767 F.2d 125, 131 ___ _______ ________ (5th Cir. 1985); Gilchrist v. Bolger, 733 F.2d 1551, 1557 (11th _________ ______ Cir. 1984); Baez v. United States Dep't of Justice, 684 F.2d 999, ____ ______________________________ 1004 & n.28 (D.C. Cir. 1982) (collecting cases from ten 45 circuits). The Sixth Circuit has gone so far as to catalogue the justifications that it deems acceptable and unacceptable for denying costs in the Rule 54(d) milieu. See White & White, 786 ___ _____________ F.2d at 730.28 In the Seventh Circuit, costs may be denied only when the losing party is indigent or "there has been some fault, misconduct, default, or other action worthy of penalty" on the winner's side. Burroughs v. Hills, 741 F.2d 1525, 1542 (7th _________ _____ Cir. 1984), cert. denied, 471 U.S. 1099 (1985). _____ ______ To the present, this court has been more muted both about a district judge's duty to explain a denial of costs and about the reasons that may warrant such a denial.29 In addressing those subjects today, we stop short of requiring district courts to state reasons or make elaborate findings in every case when acting under Rule 54(d). Instead, we hold that, if the basis for denying costs is readily apparent on the face of the record, a trial court need not explain its action merely for ____________________ 28The White & White court articulated four circumstances in _____________ which it believed costs might be denied (the taxable expenditures are unnecessary or unreasonably large; the prevailing party needlessly prolonged the proceedings; a prevailing plaintiff's recovery is so insignificant that his or her victory amounts to a defeat; the issues prove to be close and difficult), two circumstances that a district court must ordinarily ignore (the jury's seeming generosity; the prevailing party's ability to pay his or her own costs), and two circumstances which, though relevant, are insufficient, standing alone, to warrant an exercise of negative discretion (a losing party's good faith; the propriety with which the loser conducted the litigation). See ___ White & White, 786 F.2d at 730. _____________ 29We have, however, reversed a district court's denial of costs to a prevailing party when the court neglected to furnish any valid explanation for the denial. See Templeman v. Chris ___ _________ _____ Craft Corp., 770 F.2d 245, 249 (1st Cir.), cert. denied, 474 U.S. ___________ _____ ______ 1021 (1985). 46 explanation's sake.30 If, however, the situation is less than obvious, the court must offer some statement as to why it denied statutory costs to a prevailing party. Adopting this rule balances the need for findings against the proliferation of busywork that threatens to inundate the district courts. It also parallels an approach that has served us well in analogous contexts. See, e.g., Foster v. Mydas ___ ____ ______ _____ Assocs., Inc., 943 F.2d 139, 141-43 (1st Cir. 1991) (reaffirming, _____________ in the context of both 42 U.S.C. 1988 and Fed. R. Civ. P. 11, that a district court, absent a readily apparent basis, must articulate the reasons undergirding a fee award); Figueroa-Ruiz _____________ v. Alegria, 905 F.2d 545, 549 (1st Cir. 1990) ("While we do not _______ hold that the district court must make findings and give explanations every time a party seeks sanctions under Rule 11, we do require a statement when the reason for the decision is not obvious or apparent from the record."); Figueroa-Rodriguez v. __________________ Lopez-Rivera, 878 F.2d 1488, 1491 (1st Cir. 1988) (discussing the ____________ need for findings when the reasons for invoking Fed. R. Civ. P. 16(f)'s sanction provisions are less than evident). 2. Application. Our overview completed, we now apply 2. Application. ___________ Rule 54(d) to the facts of this case. Appellants argue that the district court erred by summarily precluding an award of costs under Rule 54(d) without explanation and without even entertaining a bill of costs. We think the contention has ____________________ 30Although we do not impose an absolute duty to set forth findings in all cases, we remind the district courts that "reasonably complete findings at the trial court level invariably facilitate the appellate task." United States v. De Jesus, 984 _____________ _________ F.2d 21, 22 n.4 (1st Cir. 1993). 47 partial merit. a. a. __ To the extent that the district court's order prevents appellants from reclaiming their mandatory cost-sharing assessments through the medium of Rule 54(d), we discern no error. As evidenced by the record, these payments were primarily directed into the operating budgets of the JDD and DLP. In a prior ruling, the district court explained that the assessments helped subsidize such general overhead expenses as rent, utilities, telephone charges, and staff salaries. See Hotel Fire ___ __________ Litig., 142 F.R.D. at 46 & n.19. We agree with Judge Acosta that ______ 28 U.S.C. 1920 does not identify "[t]hese general litigation expenses . . . as taxable." Id. at 46; see also Wahl v. Carrier ___ ___ ____ ____ _______ Mfg. Co., 511 F.2d 209, 217 (7th Cir. 1975) (disallowing similar _________ overhead expenses); 6 James W. Moore et al., Moore's Federal ________________ Practice 54.77[8], at 54-480 (2d ed. 1993) (stating that ________ "general overhead expense[s] . . . are not costs within [section 1920] and Rule 54(d)"). Nor can parties dissect case-management assessments in an attempt to trace every last penny and thereby attribute fractional shares to expenses which, if freely incurred by an individual litigant, might qualify as taxable costs. We will not paint the lily. Rule 54(d) cannot be stretched beyond the parameters defined in section 1920. See ___ Denny, 880 F.2d at 1468; Templeman v. Chris Craft Corp., 770 F.2d _____ _________ _________________ 245, 249-50 (1st Cir.), cert. denied, 474 U.S. 1021 (1985); Bosse _____ ______ _____ v. Litton Unit Handling Sys., 646 F.2d 689, 695 (1st Cir. 1981). _________________________ Accordingly, district courts possess no authority under Rule 54(d) to tax as costs case-management charges of a type or kind 48 unenumerated in 28 U.S.C. 1920, including, without limitation, general overhead expenses paid pursuant to case-management orders in mass disaster litigation. It follows inexorably that the court below correctly treated these expenditures as lying outside the stunted reach of Rule 54(d). b. b. __ The district court's September 11, 1992 final judgment regarding the claims against the pre-fire insurers also barred recovery of any ordinary costs incurred by appellants. The district court gave no explanation for its curt preclusion of taxable costs, and none is evident from the record. Moreover, by acting in so peremptory a manner, the court foreclosed appellants from requesting ordinary costs in the ordinary fashion. See ___ generally D.P.R. Loc. R. 331.1 (allowing prevailing party ten _________ days from entry of judgment in which to file a verified bill of costs). On this record, we think that the district court abused its discretion by depriving appellants of an opportunity to seek ordinary costs, presumptively taxable under Rule 54(d), without a word of explanation.31 c. c. __ To sum up, Rule 54(d) provides appellants only limited comfort; upon the filing of bills of costs, the pre-fire insurers will recover any itemized expenses that are statutorily allowable, unless the district court offers a sound reason for ____________________ 31Appellants indicate that they incurred some taxable photocopy expenses. See generally Rodriguez-Garcia, 904 F.2d at ___ _________ ________________ 100 (holding certain photocopying expenses recoverable under Rule 54(d)). We have adequate reason to believe that they may also have incurred other expenses taxable as costs. 49 denying costs. However, to the extent that appellants invoke the rule as a means of retrieving the big-ticket items that constitute the centerpiece of these appeals the court-ordered cost-sharing assessments they are fishing in an empty stream. B. Reallocation of Court-Ordered Assessments. B. Reallocation of Court-Ordered Assessments. _________________________________________ Appellants also argue that, even if the mandatory assessments fall outside Rule 54(d)'s domain, they may still be reallocated. This asseveration supposes a federal court power, unrelated to Rule 54(d), to redistribute, after judgment, an initial division of discovery expenses among all parties, despite the absence of an explicit reservation of the right to do so. We think appellants' premise is sound. We hold that a district court possesses the authority to reallocate court- imposed case-management expenses if, in the exercise of its considered judgment, it determines that equity and the interests of justice so require. In the sections that follow, we trace the derivation of that power, propose broad guidelines for its use, and discuss what remains to be done in this instance. 1. Source of Power. The exigencies of complex, 1. Source of Power. _________________ multidistrict litigation change the ordnance with which courtroom battles are fought. Traditional procedures for serving papers and gathering information must often give way to innovations promoting economy and efficiency. See Manual for Complex ___ ____________________ Litigation 20.22, at 15 (2d ed. 1985). Moreover, the sheer __________ number of parties and issues produces a "critical need for early, active involvement by the judiciary." Id. 20.1, at 5. To ___ facilitate this involvement, explicit grants of authority contained in the Civil Rules, which supplement the trial court's 50 inherent power to manage litigation, "enable the judge to exercise substantial control and supervision over the conduct of the litigation." Id. at 6. ___ Recent amendments to the Civil Rules have augmented the trial judge's arsenal of case-management weapons. For example, the 1983 overhaul of Rule 16 "encourage[s] pretrial management that meets the needs of modern litigation." Fed. R. Civ. P. 16 advisory committee's notes. The drafters thought that cases would be disposed of "more efficiently and with less cost and delay" if "a trial judge intervene[s] personally at an early stage to assume judicial control over a case." Id.; see also ___ ___ ____ Figueroa-Rodriguez, 878 F.2d at 1490 (acknowledging that in a __________________ time "of increasingly complicated cases and burgeoning filings, judges must have at their fingertips smooth-running, productive machinery for conducting litigation and managing caseloads"). In this multidistrict litigation, involving upward of 2000 parties and raising a googol of issues, Judge Acosta's power to mandate contributions to, inter alia, a central discovery _____ ____ depository can scarcely be doubted. See Recticel, 859 F.2d at ___ ________ 1001, 1004; see also David F. Herr, Multidistrict Litigation ___ ____ ________________________ 9.7.3, at 205 (1986) (recognizing "the potential use of a document depository as a means of facilitating efficiency"). While no procedural rule directly addresses pretrial cost-sharing orders per se, Rule 26(f) expressly authorizes trial judges, ___ __ following discovery conferences, to enter orders for "the allocation of expenses[] as are necessary for the proper 51 management of discovery." Fed. R. Civ. P. 26(f).32 We believe that this rule is flexible enough to serve as the source of judicial authority for imposing cost-sharing orders in complex cases.33 The expense allocation orders Rule 26(f) authorizes "may be altered or amended whenever justice so requires." Fed. R. Civ. P. 26(f). For that reason, as well as on the basis of common sense, a trial judge's power to promulgate cost-sharing orders must carry with it the power to readjust such orders as changed circumstances require. Indeed, in denying a petition for mandamus addressed to the propriety of the very cost-sharing orders here at issue, we acknowledged the district court's power to "reshape and refashion its cost-sharing orders as new information comes to light, or as information already known takes on added significance." Recticel, 859 F.2d at 1004. We reaffirm ________ this message today,34 confident that our reading of Rule 26(f) ____________________ 32Fed. R. Civ. P. 26(f) was adopted in 1980 in the hope that judicial intervention would curb discovery abuse. See Fed. R. ___ Civ. P. 26(f) advisory committee's notes. Among other things, the rule interjects the trial court in developing "a reasonable program or plan for discovery." Id. ___ 33This court has already remarked the striking similarity between ordinary discovery orders and the case-management orders that Judge Acosta tailored for use in this litigation. See ___ Recticel, 859 F.2d at 1002-03. ________ 34While we emphasize that the power we describe here is an implied power derived from the Civil Rules, we note that the Supreme Court has, in limited circumstances, sanctioned federal court resort to an intrinsic power analogous to its statutory prerogative to assess costs and attorneys' fees. See Chambers v. ___ ________ NASCO, Inc., 111 S. Ct. 2123, 2133 (1991) (discussing federal ____________ courts' inherent power to shift fees in certain circumstances); Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, ___________________________ ________________ 258-59 (1975) (similar). Be that as it may, we need not decide today whether, apart from the power derived from the Civil Rules, a district court possesses the inherent power to effectuate 52 does not loose some strange new beast to prey on unsuspecting litigants. In the last analysis, a district court's intrinsic power to alter its own directives is a familiar one, applicable to many other sorts of pretrial orders. See, e.g., Poliquin v. ___ ____ ________ Garden Way, Inc., ___ F.2d ___, ___ (1st Cir. 1993) [Nos. 92- ________________ 1115, 92-1116, slip op. at 20] (noting that pretrial protective orders are "always subject to the inherent power of the district court to relax or terminate the order, even after judgment"). Consequently, we hold that, despite the absence of any language in a cost-sharing order reserving a trial judge's right to rearrange the burdens therein imposed at a later date, "it is certain beyond peradventure that [a] district court can . . . entertain motions for the reallocation of expenses." Recticel, ________ 859 F.2d at 1004-05. This power is the logical (and, we think, necessary) extension of the court's authority to fashion pretrial cost-sharing orders in the first place. To say that the power to reallocate assessments under cost-sharing orders can fairly be implied from the Civil Rules is not to say that the district court's exercise of that power is unbridled. In our view, the power is coupled with an interest in fairness and its exercise must, therefore, comport with first principles of equity. It is to this unexplored terrain that we now turn. 2. The Standards Governing Reallocation. Although 2. The Standards Governing Reallocation. _____________________________________ cost-sharing orders are sui generis, they almost always ___ _______ constitute a way of fueling an array of hand-crafted procedural ____________________ reallocation of cost-sharing assessments previously imposed. 53 devices designed to sort and resolve myriad claims in an equitable, efficient, comparatively inexpensive manner. A subsequent decision to readjust the burdens imposed by such orders, and the specific redistribution that results, must remain faithful to that aim.35 The power to readjust, then, must be exercised in accordance with a set of equitable principles, shaped by the circumstances indigenous to the litigation but rooted in the concept that court-imposed burdens should, in the end, balance derived benefits. In the paragraphs that follow, we touch lightly upon certain fundamental principles that should inform the determination of whether a post-judgment reallocation of court-ordered expenses is advisable, and if so, to what extent. a. a. __ Upon motion, a district court should consider reallocating costs after entry of judgment when, with the acuity of hindsight, it determines that a party or group of parties has significantly failed to derive the expected benefits from burdens imposed under cost-sharing orders entered earlier in the litigation, or has derived those benefits to a significantly greater or lesser extent than other similarly situated parties. This rule dominates the constellation of factors bearing on the ____________________ 35We limit our discussion to cases where, as here, mandatory cost-sharing orders are largely silent on the matter of an eventual redistribution of expenses. A district court may, of course, build into a cost-sharing order a mechanism for eventual redistribution, the structure and propriety of which would have to be considered on its own merits against the backdrop of the particular litigation. Indeed, the court below formulated such a mechanism, but limited its operation to cost-sharing assessments levied against plaintiffs' attorneys. See Pretrial Order No. ___ 127, at 39-40; see also supra note 2. ___ ____ _____ 54 decision to reallocate. b. b. __ In contrast to the well-recognized presumption that prevailing parties should recover their taxable costs under Rule 54(d), there is no basis for a parallel presumption that the winners' case-management expenses should be borne by the losers. Thus, a prevailing party will not automatically receive a favorable reallocation, but must persuade the court of an entitlement to one. This conclusion flows naturally from the idea that derived benefit is the shining star in the readjustment galaxy: when all is said and done, the benefit a party secures from forced contributions to joint ventures in complex litigation may be unrelated, or vastly disproportionate, to the party's success on the merits. c. c. __ To say that prevailing parties are not presumptively entitled to a favorable reallocation of cost-sharing assessments is not to say that either the fact or the scope of a litigant's victory is irrelevant to a district court's reassessment of the matter. The inherent clarity of a case and the ease with which it can be decided without resort to heroic measures ordinarily affect the degree of benefit the prevailing party obtains from the availability of innovative procedural mechanisms. Hence, the extent to which a litigant achieves a swift, across-the-board success not correlated with case-management tools must necessarily inform the district court's reallocation decision. The presence of knotty issues, fought, in the Stalingrad tradition, from rock to rock and tree to tree, often cuts the 55 other way. Close cases, particularly those that are fact- dominated, tend to be cases in which all parties derive considerable benefit from the availability of sophisticated case- management tools. d. d. __ When a district court considers a party's request to reallocate sums previously assessed, the requestor's ability to shoulder the expense is immaterial. Cost-sharing orders are attempts to distribute systemic costs in an equitable manner; they should not be transmogrified into a method of forcing deep pockets, whenever and for whatever reason they appear in a suit, to bear the crushing financial burdens of complex litigation. Equity in readjusting cost-sharing orders depends upon who, in the end, garnered a disproportionate slice of the benefits the orders sought to provide, not upon who can best afford to pay.36 Although the operative considerations are not entirely the same, this principle parallels the Sixth Circuit's longstanding view that a prevailing party's ability to pay his or her own costs is an improper basis for refusing to tax costs ____________________ 36We recognize that the presence of an indigent party may affect the reallocation decision. Cf., e.g., Neitzke v. ___ ____ _______ Williams, 490 U.S. 319, 324 (1989) (discussing Congress's desire ________ to "ensure that indigent litigants have meaningful access to the federal courts"); Adkins v. E. I. DuPont de Nemours & Co., 335 ______ _______________________________ U.S. 331, 339 (1948) (refusing to require litigants "to contribute to payment of costs[] the last dollar they have or can get" before becoming entitled to forma pauperis standing); _____ ________ Aggarwal v. Ponce Sch. of Medicine, 745 F.2d 723, 728 (1st Cir. ________ _______________________ 1984) (warning that courts must go slowly in allowing "toll- booths [to] be placed across the courthouse doors"); Burroughs, _________ 741 F.2d at 1542 (allowing a district court to deny costs under Rule 54(d) when the losing party is indigent). We do not probe the point, however, because no party involved in these appeals has asserted such a claim. 56 against the loser under Rule 54(d). See White & White, 786 F.2d ___ ______________ at 730; Lewis v. Pennington, 400 F.2d 806, 819 (6th Cir.), cert. _____ __________ _____ denied, 393 U.S. 983 (1968). ______ e. e. __ Cost-sharing orders are designed to inure to the benefit of all contributing parties. A case's history and particular circumstances may reveal that some parties carried heavy, even excessive, loads, while other parties enjoyed a relatively free ride. Reallocating cost-sharing assessments affords a way of balancing case-specific inequities. For example, a party's interjection of unmeritorious issues that unnecessarily lengthen the litigation might favor the conclusion that others have paid too much and the interjector has paid too little. Cf. Lichter Found., Inc. v. Welch, 269 F.2d 142, 146 ___ ____________________ _____ (6th Cir. 1959) (approving denials of costs to prevailing parties under Rule 54(d) on this basis). A cost-readjustment analysis, like all decisions grounded in equity, must leave room for such case-specific factors. f. f. __ We believe that we have said enough to erect a flexible framework for reallocation analysis and, hopefully, to provide a modicum of general guidance to the district courts. We caution that the relative weight and impact of relevant considerations will vary from situation to situation, and, moreover, that, given the virtually limitless number of permutations likely to be encountered in civil litigation, our compendium of factors is not all-encompassing. 3. Remedy. The question of remedy remains. It is 3. Remedy. ______ 57 clear that an appellate court is not the most propitious forum for shaking up a preexisting expense allocation. By definition, cost-sharing orders originate with the district court as a component of the court's case-management function. Given the district judge's intimate knowledge of the circumstances under which the imposts were conceived, his familiarity with the nature and purposes of the assessments, his front row seat throughout the litigation, and his matchless ability to measure the benefits and burdens of cost-sharing to the parties in light of the litigation's progress and stakes, we are convinced that the district judge has the coign of vantage best suited to determining, in the first instance, whether, and if so, how, the initial cost-sharing orders should be modified. We are keenly aware that this litigation has exhibited a capacity to chew up endless amounts of judicial resources and we are extremely reluctant to prolong matters. Here, however, the necessity for remanding is plain: not only is the trial judge best equipped to address the remaining problems, but also, as we explain below, there is at least a prima facie case for some reallocation of the _____ _____ assessments. Indeed, the collocation of circumstances strongly suggests that the pre-fire insurers did not reap in full the benefits associated with several of the procedural innovations they helped to fund. We run the gamut. More than half of each appellant's assessment supplemented the budgets of the JDC and JDD, facilities devoted to the economical coordination and speedy completion of discovery. Because the pre-fire insurers defeated all adverse claims through dispositive motions short of trial, on purely 58 legal grounds, the benefit they derived from these innovations was most likely minimal. The near-complete closure of discovery prior to appellants' appearance in the litigation, see supra p. 4 ___ _____ & note 3, rendered the JDC, established to stimulate expeditious resolution of discovery disputes, of dubious value to appellants. As for the JDD, the documents housed there were of questionable relevance vis-a-vis appellants because they were gathered during earlier litigation phases that settled a host of different issues. To be sure, appellants probably derived some benefit from the facilities they helped to fund. Certainly, they were free to peruse whatever useful evidence the JDD did contain.37 What is more, the DLP presumably facilitated the movement of papers to appellants' behoof; and appellants probably saved money through the avoidance of unnecessary duplication. But, it is difficult to fathom how contributions on a par with those of all other defendants to fact gathering largely irrelevant to the claims against appellants constituted the "most efficient use of . . . [appellants'] resources." Pretrial Order No. 127, at i. The early stage at which the district court dismissed all claims against appellants also creates doubt as to whether the substantial assessments, geared largely toward efficient fact gathering, inured to appellants' benefit to any meaningful degree. The pre-fire insurers prevailed on all claims, as a matter of law, without going to trial. The district court, having determined that no issue of fact needed debate and that ____________________ 37Nevertheless, thirteen appellants contend that they utilized no evidence contained in the JDD to support their __ dispositive motions. 59 appellees' arguments had no basis in law, see Hotel Fire Litig., ___ _________________ 802 F. Supp. at 635, 644, might be hard-pressed to conclude that appellants' huge expenditures, diverted to facilities designed, in large part, to collect, sort, and maintain factual documents, were integral to, or even marginally connected with, the pursuit of their cause. In sum, it appears from the record before us that appellants have a colorable basis for arguing that they derived minimal benefits from the assessments. Nonetheless, this hypothesis remains unproven. There may be more here than meets the eye; for one thing, the appellate record does not speak in any detail to the equities. Although an appellate court may decline to remand where remanding would be an empty exercise, see, e.g., Societe des Produits Nestle, S.A. v. Casa Helvetia, ___ ____ __________________________________ ______________ Inc., 982 F.2d 633, 642 (1st Cir. 1992) (declining to remand ____ where, once the court of appeals decided the correct rule of law, the district court's preexisting findings of fact rendered the result obvious), that is not the case here. Rather, there are pregnant questions to be mulled on remand questions on which the trial judge's viewpoint is especially important. We conclude, therefore, that the case must be returned to the district court for further proceedings before Judge Acosta. We intimate no opinion as to the appropriate outcome of those proceedings. V. BANKRUPTCY OF AN AFFILIATED ENTITY V. BANKRUPTCY OF AN AFFILIATED ENTITY We are not yet at journey's end. Two appellees, Associates and HSI, invoke the so-called automatic stay provision, 11 U.S.C. 362 (1988), in an endeavor to persuade us 60 that an affiliated firm's bankruptcy should have resulted in a stay of proceedings on appeal. We are not convinced. The essential facts are as follows. On August 5, 1991, Holders Capital Corporation (HoCap) filed for bankruptcy. Because HSI is a wholly owned subsidiary of HoCap and Associates is a limited partnership whose general partner is also a wholly owned subsidiary of HoCap, both appellees assert that continued prosecution of the pre-fire insurers' appeals, as against them, constitutes an impermissible attempt to obtain possession of the debtor's property in violation of 11 U.S.C. 362(a)(3). This assertion need not detain us. As a general rule, section 362(a)'s automatic stay provisions apply only to the debtor in bankruptcy. See Austin v. Unarco Indus., Inc., 705 ___ ______ ____________________ F.2d 1, 4 (1st Cir.), cert. dismissed, 463 U.S. 1247 (1983); see _____ _________ ___ generally _________ In re Western Real Estate Fund, Inc., 922 F.2d 592, 600 (10th ______________________________________ Cir. 1990), modified on other grounds, 932 F.2d 898 (10th Cir. ________ __ _____ _______ 1991). As entities legally distinct from HoCap, see Parkview- ___ _________ Gem, Inc. v. Stein, 516 F.2d 807, 811 (8th Cir. 1975) (holding _________ _____ that where debtor, qua lessee, had previously assigned all ___ leasehold rights to a subsidiary, the lessor's action to terminate the lease could not be enjoined because, despite the fact that the termination would likely have "an adverse [e]ffect upon the debtor," no claim was asserted against the debtor); In __ re Bank Ctr., Ltd., 15 B.R. 64, 65 (Bankr. W.D. Pa. 1981) ____________________ (refusing to stay an action against the partner of a bankrupt partnership because a "partner is a separate entity from the partnership"), the two corporate appellees are not presumptively 61 entitled to the protection of any automatic stay which may be extant in the HoCap bankruptcy proceeding. Since these appeals implicate no attempt to assert, enforce or recover any claim against HoCap or its property, the appeals may proceed. See 11 U.S.C. 362(a)(3) (staying actions to "obtain possession ___ of" or "exercise control over" the bankrupt estate); see also ___ ____ Fragoso v. Lopez, F.2d , (1st Cir. 1993), [No. 92- _______ _____ ____ ____ ____ 2046, slip op. at 14] (noting federal court reluctance to refrain from "deciding legal issues pertaining to a party involved in a federal bankruptcy proceeding"); Picco v. Global Marine Drilling _____ _______________________ Co., 900 F.2d 846, 850 (5th Cir. 1990) ("The automatic stay of ___ the bankruptcy court does not divest all other courts of jurisdiction to hear every claim that is in any way related to the bankruptcy proceeding."). VI. CONCLUSION VI. CONCLUSION We need go no further. We hold that the district court erred in precluding, without explanation, the taxation of ordinary costs under Rule 54(d) in favor of appellants (who were the prevailing parties). Hence, we remand to allow appellants an opportunity to file bills of costs in the usual form. The lower court did not err, however, in refusing to treat case-management expenditures as taxable costs within the purview of Rule 54(d) and its statutory helpmeet, 28 U.S.C. 1920. We also hold that the district court possesses the implied power, under Fed. R. Civ. P. 26(f), to revisit the initial allocations of case-management expenses and readjust the same as equity may require. Because the lower court did not afford appellants a fair opportunity to seek such a reallocation, 62 we remand for that purpose as well. Appellants shall file their motions to reallocate with the district court no later than thirty days from the date our mandate issues.38 Vacated and remanded; one-half costs to appellants. Vacated and remanded; one-half costs to appellants. __________________________________________________ ____________________ 38In this connection we urge the district courts within this circuit to consider framing local rules to the effect that, henceforth, any application for reallocation of court-imposed cost-sharing expenses must be filed within thirty days of the entry of final judgment. Cf. White, 455 U.S. at 454 (observing ___ _____ that district courts are free "to adopt local rules establishing timeliness standards for the filing of claims for attorney's fees"); Obin v. District No. 9, Int'l Ass'n of Machinists & ____ _______________________________________________ Aerospace Workers, 651 F.2d 574, 583 (8th Cir. 1981) ___________________ (recommending a rule that claims for attorneys' fees must be filed within twenty-one days after entry of judgment). 63